UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

ABU-ALI ABDUR' RAHMAN         )
         )
v.         )     No.  3:96-0380
         )     JUDGE CAMPBELL
RICKY BELL, Warden         )     DEATH PENALTY

MEMORANDUM

I. Introduction

Pending before the Court are certain reopened prosecutorial misconduct claims originally

brought in Petitioner's Amended Petition For A Writ Of Habeas Corpus In A Capital Case

(Docket No. 42). The Petitioner has filed briefs supporting the claims (Docket Nos. 330, 332),

and the Respondent has filed briefs in response. (Docket Nos. 331, 333).

The parties rely on the existing record in making their arguments, and the Court finds

oral argument unnecessary.  The Court has reviewed the pleadings and briefs filed by both

parties, the record of Petitioner's underlying conviction, and the entire record in this case.  For

the reasons set forth below, the Court concludes that the Petitioner's pending claims are without

merit, and are dismissed.

II. Procedural and Factual Background

Petitioner filed a petition for a writ of habeas corpus in this Court, pursuant to 28 U.S.C.

§ 2254, on April 23, 1996.  In a prior opinion, this Court recited the procedural and factual

background of this case as follows:

> Petitioner was tried and convicted of first degree murder, assault with intent to
> commit murder, and armed robbery. (Addendum 1, at 2000). After a subsequent
> sentencing hearing, Petitioner received the death penalty for the first degree
> murder conviction. The jury found the existence of three aggravating
> circumstances: (1) Petitioner had been convicted of prior violent felonies (assault

with a deadly weapon and second degree murder); (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; and (3) the murder was committed while the Petitioner was engaged in committing or attempting to commit a first degree murder or robbery. (Addendum 1, 1986-2001). The court sentenced the Petitioner to life on each of the other offenses, to be served consecutively to each other. (Addendum 1, at 13-14).FN2

> FN2. The court also determined that, if the death sentence were to later be reduced to a life sentence, that sentence would be served consecutively to the other life sentences. (Addendum 1, at 14). In addition, the state sentences would be served consecutively to the federal sentence for which Petitioner was on parole when he was convicted of the state offenses. ( Id.)

Petitioner was represented at trial by Lionel Barrett and Sumter Camp. After trial, Mr. Barrett and Mr. Camp withdrew, and the state court appointed Richard Dinkins to represent Petitioner on direct appeal to the Tennessee Supreme Court. (Addendum 1, Technical Record, at 87). The Tennessee Supreme Court affirmed Petitioner's conviction and sentence. State v. Jones, 789 S.W.2d 545 (Tenn.1990).

> The state court appointed another attorney to assist Mr. Dinkins in the post-conviction proceedings, who was joined by a volunteer lawyer from the Capital Case Resource Center. (Addendum 11, Technical Record, at 23, 50, 82). The post-conviction trial court found trial counsel had been ineffective in their representation of Petitioner at sentencing. (Addendum 11, at 81-109). The court, however, went on to find that trial counsel's deficiencies did not result in prejudice to the Petitioner and rejected all other claims. ( Id.) The Tennessee Court of Criminal Appeals FN3 affirmed that judgment, and the Tennessee Supreme Court denied Petitioner's application for permission to appeal. Jones v. State, 1995 WL 75427, at *2 (Tenn.Crim.App. Feb. 23, 1995).

> FN3. The panel consisted of only two judges, rather than the usual three judges.

The post-conviction trial court gave the following summary of facts in its opinion:

> The facts are that petitioner and his codefendant, Harold Deval Miller, went to the victims' home. Petitioner wants to describe the events that took place after that as a misguided attempt to rid the community of drug dealers, as it appears that the victim, Patrick

2

Daniels, was a small time marijuana dealer. Codefendant, Mr. Miller, testified for the State, however, and he described the motive for the visit as robbery. The victim, Patrick Daniels, lived with Norma Norman. Petitioner and Miller entered the home and bound Daniels and Norman. What happened next is described in the appellate decision.

> The victim in this case was bound, gagged, and blind folded with duct tape. He was distressed, crying, and begging not to be hurt. Defendant stood over him and stabbed him six (6) times, four (4) times penetrating the heart. He then watched as the victim went into convulsions, blood spewing from his nose and mouth. His accomplice testified, "he was working himself up on a rhythm," he was "cool" and "under control." The victim continued to plead with the defendant as he was being stabbed.

State v. Jones, supra, at 550. The defendant also stabbed Norma Norman numerous times, but she miraculously survived the attack.

(Addendum 11, 83-84).

Abdur'Rahman v. Bell, 999 F.Supp. 1073, 1078 (M.D. Tenn. 1998).

In 1998, this Court held an evidentiary hearing, and ruled on Petitioner's claims. The Court determined that Petitioner's state court conviction should be upheld, but granted the writ as to his death sentence based on ineffective assistance of counsel. (Docket Nos. 205, 206). Abdur'Rahman v. Bell, supra. See also Abdur'Rahman v. Bell, 990 F.Supp. 985 (M.D. Tenn. 1998)(Granting summary judgment to Respondent on issues related to jury instructions); (Docket Nos. 133, 134 (Denying summary judgment to Respondent on procedural issues because Petitioner raised factual issues regarding actual innocence)); (Docket Nos. 156, 157 (Granting summary judgment to Respondent on various claims; denying summary judgment on certain ineffective assistance of counsel claims)).

In reaching its decision denying the writ as to the Petitioner's conviction, the Court

3

denied Petitioner's claims that the state prosecutor engaged in prosecutorial misconduct during the state court proceedings. Id. The Court considered and denied certain of those claims on the merits, as discussed below. Id. The Court determined that the remaining prosecutorial misconduct claims had not been exhausted in state court because the Petitioner failed to seek discretionary review of those claims in the Tennessee Supreme Court, and therefore, were procedurally defaulted. Id.

The parties appealed the Court's decision to the Sixth Circuit Court of Appeals. (Docket Nos. 207, 210). While the appeal was pending and before the Sixth Circuit issued an opinion in the case, on June 7, 1999, the United States Supreme Court issued its decision in O'Sullivan v. Boerckel, 526 U.S. 838, 119 S.Ct. 1728, 1734, 144 L.Ed.2d 1 (1999). The O'Sullivan Court held that a prisoner was required to present his claims to the highest court in the state for discretionary review to satisfy the habeas corpus exhaustion requirement, *unless* a state court makes clear that discretionary review is "unavailable." Id.

On September 13, 2000, the Sixth Circuit affirmed the Court's decision upholding Petitioner's conviction, but reinstated the death sentence, finding that the Petitioner had not been prejudiced by his trial counsel's deficient performance. Abdur'Rahman v. Bell, 226 F.3d 696 (6th Cir. 2000). The Petitioner applied for a writ of certiorari in the United States Supreme Court, which was denied on October 9, 2001. Abdur'Rahman v. Bell, 534 U.S. 970, 122 S.Ct. 386, 151 L.Ed.2d 294 (2001). The Petitioner then applied for rehearing, which was denied on December 3, 2001. Id.

In the meantime, on June 28, 2001, the Tennessee Supreme Court promulgated Rule 39

of the Rules of the Supreme Court of Tennessee[1] apparently in response to the Supreme Court's

decision in O'Sullivan. Rule 39 essentially states that a litigant is not required to seek review in

the Tennessee Supreme Court of a claim denied by the Tennessee Court of Criminal Appeals in

order for that claim to be considered fully exhausted in the state courts.

Based on the promulgation of Rule 39, Petitioner then sought to set aside this Court's

dismissal of his prosecutorial misconduct claims for failure to exhaust. After several years of

litigation regarding Petitioner's request, see Abdur'Rahman v. Bell, 392 F.3d 174 (6th Cir. 2004);

Bell v. Abdur'Rahman, 125 S.Ct. 2991 (2005); Abdur'Rahman v. Bell, 425 F.3d 328 (6th Cir.

2005); Abdur'Rahman v. Bell, 493 F.3d 738 (6th Cir. 2007), a panel of the Sixth Circuit issued an

order finding that the Petitioner's Motion "was timely made pursuant to Fed. R. Civ. P. 60(b)(6)

rather than a second or successive habeas corpus petition," and remanded the case to this Court

"for a determination of whether the motion should be granted." (Sixth Circuit Order entered

October 19, 2007; Docket No. 312).

---

[1] Rule 39 provides as follows:

In all appeals from criminal convictions or post-conviction relief
matters from and after July 1, 1967, a litigant shall not be required
to petition for a rehearing or to file an application for permission to
appeal to the Supreme Court of Tennessee following an adverse
decision of the Court of Criminal Appeals in order to be deemed to
have exhausted all available state remedies respecting a claim of
error. Rather, when the claim has been presented to the Court of
Criminal Appeals or the Supreme Court, and relief has been
denied, the litigant shall be deemed to have exhausted all available
state remedies available for that claim. On automatic review of
capital cases by the Supreme Court pursuant to Tennessee Code
Annotated, § 39-13-206, a claim presented to the Court of
Criminal Appeals shall be considered exhausted even when such
claim is not renewed in the Supreme Court on automatic review.

This Court ultimately granted the Petitioner's Rule 60(b) request to consider the merits of the prosecutorial misconduct claims that were previously denied for failure to exhaust in the state courts. (Docket Nos. 321, 322). Respondent filed an application for permission to appeal that decision, which was subsequently denied by the Sixth Circuit. (Docket Nos. 323, 326). The parties have now fully briefed the claims reopened as a result of the Rule 60(b) motion and the Court considers those claims below.

III. <u>Analysis</u>

Petitioner's claims allege that the state prosecutor failed to disclose certain evidence in connection with his criminal trial and that he otherwise engaged in misconduct. In <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 83 S.Ct. 1194. <u>See also</u> <u>O'Hara v. Brigano,</u> 499 F.3d 492, 502 (6th Cir. 2007). The duty to disclose extends to impeachment evidence, or evidence affecting the credibility of a witness whose reliability may be determinative of guilt or innocence. <u>United States v. Bagley</u>, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); <u>O'Hara</u>, 499 F.3d at 502.

The Sixth Circuit has held that "[m]ateriality pertains to the issue of guilt or innocence, and not to the defendant's ability to prepare for trial." <u>United States v. Bencs</u>, 28 F.3d 555, 560-61 (6th Cir. 1994). Evidence is considered material "'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" <u>O'Hara</u>, 499 F.3d at 502 (quoting <u>United States v. Phillip</u>, 948 F.2d 241, 249 (6th Cir.

1991)).

The Sixth Circuit has also held that "Brady generally does not apply to delayed disclosure of exculpatory information, but only to complete failure to disclose." O'Hara, 499 F.3d at 502 (quoting Bencs, 28 F.3d at 560). "Delay ... violates Brady [only] when the delay itself causes prejudice." Id. (quoting United States v. Patrick, 965 F.2d 1390, 1400 (6th Cir.1992)).

As for Petitioner's prosecutorial misconduct claims involving conduct other than a failure to disclose information, the Court is to consider whether the challenged conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

Claim D.1(1) – Petitioner claims that the transcript of Petitioner's 1972 murder trial, which included the testimony of Dr. Asot M. Masri regarding Petitioner's mental illnesses, should have been disclosed to the defense as Brady material. (Amended Petition, at 54). Respondent argues that the Court has already ruled on the merits of this claim.

In an earlier Memorandum, the Court ruled that the transcript of Petitioner's murder trial in 1972 was favorable to the accused, but was not material.[2]

---

[2]    The Court ruled as follows:

> In 1972, Petitioner was tried in a Virginia federal court for the murder of a fellow prisoner, Michael Stein. (Petitioner's Exhibit 131). He was convicted of second degree murder. (Exhibit 105). At that trial, a psychiatrist, Dr. Asot M. Masri, opined that Petitioner had been in a 'homosexual panic' when he stabbed Stein.FN20 (Petitioner's Exhibit 131, at 48). He testified that the Petitioner had a Borderline Personality Disorder and Schizoid Personality. (Petitioner's Exhibit 131, at 53). The Government called another psychiatrist, Dr. Robert Eardley, who

opined that Petitioner was not suffering from a mental disease when he stabbed Stein. (Petitioner's Exhibit 131, at 57-58, 59, 66).

> FN20. Dr. Masri characterized homosexuality as a mental disease. (Petitioner's Exhibit 131, at 51).

Petitioner argues that this evidence was exculpatory because the State argued at trial that Petitioner did not suffer from any emotional disturbance.

There is no dispute that the prosecutor had this transcript in his possession at some point before trial began. There is also no dispute that he did not provide the transcript to the defense.FN21 Respondent contends that the state court was correct in concluding that the transcript was not favorable to the defense because neither psychiatrist opined that the Petitioner was insane.

FN21. During the hearing, the prosecutor explained his reasoning:

> Based on all the testimony, I concluded for two reasons, one the lapse of time or I guess you might say the distance in time between the two events and what I call very weak testimony from the defense psychiatrist at the trial, that it was not exculpatory, would have no bearing on explaining whether at the time of this crime he had a mental illness or suffered from any kind of emotional snapping, because the situation in the federal prison was one where even taken in light most favorable to the defendant was triggered as a result of a sexual assault on him.

> That wasn't the case here where the defendant sought out the victim and went to the victim and pursued the victim.

> (Transcript, at 1015-16).

> As for mitigation, the prosecutor testified that his interpretation of the psychological testimony was that during the previous killing, the Petitioner "got angry and snapped." (Transcript, at 10 16). There was no evidence, according to the prosecutor, that there were any external circumstances operating on the Petitioner during the 1986 crime. ( Id.)

The Court believes this information was favorable to the Petitioner because the Petitioner had stated his intention to rely on a mental illness defense at trial and sentencing (Transcript, at 959-60, 963), and Dr. Masri's testimony supported that

8

Petitioner raises this claim here as part of his argument that the cumulative effect of all the instances of prosecutorial misconduct resulted in prejudice to the Petitioner, and rendered his trial fundamentally unfair. As explained herein, however, the Court is not persuaded that Petitioner's prosecutorial misconduct claims have merit. The Court declines to reconsider its

---

defense. The Court is not persuaded, however, that the prosecution's failure to provide the transcript to defense counsel rises to the level of a due process violation because Dr. Masri's testimony was not 'material.'

In a later section of this Memorandum, the Court concludes that Petitioner received ineffective assistance of counsel because his trial counsel failed to investigate his mental health history, background and other areas of mitigation. The Court is not persuaded, however, that 'the proceeding would have been different' if the prosecution had disclosed Dr. Masri's testimony to Petitioner's trial counsel. Petitioner's trial counsel already had various clues that should have led them to investigate Petitioner's mental health history, such as the records of Petitioner's evaluation at MTMHI before trial, and conversations with Petitioner's wife. There is no reason that Dr. Masri's testimony should have been the key element prompting Petitioner's counsel to take action.

Similarly, admission of this testimony as an item of evidence during the guilt phase of the trial would not have affected the result. Had Petitioner's defense counsel hired an expert to opine that Petitioner was insane at the time of the stabbings in 1986, Dr. Masri's testimony about an incident in 1972 could have supported that opinion, but it certainly would not have been vital. Absent an insanity defense, there would be no reason to admit this evidence relating to a prior crime during the guilt phase of the trial.

As for the sentencing phase, Dr. Masri's testimony would have served as an item of mitigation relating both to the prior murder conviction, and to his mental history. But that testimony is only one item of evidence that, as the Court explains below, should have been introduced by trial counsel during the sentencing hearing as mitigation evidence. Standing alone, the Court is not persuaded that the absence of Dr. Masri's testimony undermines confidence in the outcome of the sentencing hearing.

Abdur'Rahman, 999 F.Supp. at 1089-90.

9

decision on this claim.

Claim D.1(2) – Petitioner claims that the prosecution failed to produce in sufficient time for use at trial the transcript of Co-Defendant Miller's pretrial statement. (Amended Petition, at 54, 55).[3] According to the Petitioner, the prosecution treated the statement as "Jencks" material, rather than Brady material, and did not disclose the transcript sufficiently in advance of trial to enable defense counsel to make use of it in preparation of his defense. Petitioner argues that the statement contained exculpatory information, including statements inconsistent with Miller's trial testimony, and Miller's observation of Petitioner's change in demeanor and appearance at the time of the offense, which raised questions of insanity and mitigation.

The Respondent argues that this claim was not presented to the Tennessee Court of Criminal Appeals, and therefore, remains procedurally defaulted. In response, the Petitioner points out that he raised the failure of the prosecution to disclose Miller's pretrial statements in the brief he presented to the Tennessee Court of Criminal Appeals on direct appeal. (Addendum 12, at 29-30 (Docket No. 9)).

The Petitioner's state court brief complains of the prosecution's failure to produce Miller's pretrial statements that were inconsistent with each other and with his trial testimony:

> Failure to disclose later statements inconsistent with prior statements and statements consistent with the testimony of the appellant. . . . Trial counsel made a specific request for any material variances in statements of material witnesses and received no response.

(Id.). The Court concludes that Petitioner fairly presented this claim to the state courts, and the claim is, therefore, fully exhausted. See Gray v. Netherland, 518 U.S. 152, 116 S.Ct. 2074, 135

---

[3]  The statement was introduced at the evidentiary hearing as Exhibit 51.

L.Ed.2d 457 (1996) (Exhaustion requires that claim be fairly presented to state courts to provide them with opportunity to correct alleged constitutional violations).

Alternatively, the Respondent argues that defense counsel was provided with the statement in time for use at trial as he used the statement in cross-examination. Petitioner contends that the defense was prejudiced because it did not have use of the statement in pretrial investigation and preparation. Petitioner argues that Miller's observations of the Petitioner's change in demeanor and appearance at the time of the offense would have raised questions in defense counsel's mind about the Petitioner's mental state.

The Court is not persuaded that any failure of defense counsel in pursuing a mental health defense can be attributed to the lack of notice of Miller's observations. The Petitioner was evaluated prior to trial, and was determined not to have been insane at the time of the offense, or incompetent to stand trial. (Exhibit 35 to Evidentiary hearing held in February, 1998 (hereinafter referred as "Hearing Exhibit")). As for mitigation, this Court has previously ruled that defense counsel had various clues that should have led them to investigate Petitioner's mental health history, including the MTMHI evaluation itself and conversations with the Petitioner's wife. 999 F.Supp. at 1089.

As for use of the statement at trial, the Court notes that defense counsel made frequent references to the pretrial statement during his cross examination of Miller. (Addendum 1, at 1496-1559, 1561-1571, 1574-1577 (Docket No. 9)).

The Court concludes that Petitioner has failed to establish materiality resulting from the delay in providing the statement to the defense.

Claim D.1(3) – Petitioner argues that the prosecution failed to disclose Co-Defendant

11

Miller's statements about the Southeastern Gospel Ministry ("SEGM") made to the prosecutor during interviews prior to trial. (Amended Petition, at 55-56). Petitioner alleges that during his postconviction hearing testimony, Miller indicated that he told the prosecutor the following information during those interviews:

- Miller and Petitioner joined the SEGM, a racial identity religious organization devoted to bettering the Black community;

- Miller and Petitioner were "brainwashed" by the organization;[4]

- There was a paramilitary group within the SEGM that consisted of Alan Boyd, William Beard, Miller and Petitioner;[5]

- William Beard gave Miller a pistol to be used in "operations" to clean up the Black neighborhoods;

- Petitioner told Miller that he got his shotgun from Alan Boyd;

- On the night of the killing, after leaving Daniels' apartment, Miller and Petitioner went to Miller's apartment and Petitioner made a telephone call from a booth, and Alan Boyd

_____

[4] To support this assertion, as mentioned above, the Petitioner cites Miller's testimony at the postconviction hearing. (Addendum 11, Volume III, at 37 (Docket No. 9)). On the page of the transcript cited, the term "brainwashed" is actually used by Petitioner's counsel in describing the statement of a friend or relative who had written a letter on Miller's behalf for his sentencing hearing. (Id., at 36-37). Miller went on to state that he had never seen the letter counsel was attempting to introduce in the postconviction hearing, and the letter was not admitted as evidence through Miller. (Id.) Miller did not testify that he told the prosecutor he had been "brainwashed."

[5] On the page of the postconviction hearing transcript cited by Petitioner, Miller testified that there was a "smaller group of people," including the Petitioner, Mr. Boyd, Mr. Beard, and himself, within SEGM who met separately. (Id., at 15). Miller also testified that, prior to the crime at issue here, Beard had instructed the Petitioner and Miller to "go to a numbers man and use weapons and seize proceeds from that person." (Id., at 16). Miller did not use the term "paramilitary" in describing this smaller group.

showed up a short time later;

- After leaving the apartment, Miller heard Boyd say something to the effect of "just be cool and go back to work;"

- After Petitioner's arrest, Miller went to Beard who gave him getaway money;

- Miller intentionally misled Beard as to where he was going because he feared that Beard, Boyd and the SEGM might kill him, and Miller also told others while on the run that he was fearful of Boyd, Beard and Mitchell Holley, all of the SEGM;[6] and

- Members of the SEGM provided Miller's wife, Karen, with financial assistance while Miller was on the run.[7]

(Id.)

The Respondent argues that the Petitioner's relationship with SEGM was information that the Petitioner already knew himself. The Respondent cites a letter written by defense counsel to the prosecutor before the sentencing phase in which counsel suggests that he may call the prosecutor to testify about the Petitioner's affiliation with SEGM. (Hearing Exhibit 78). Regarding Miller, the letter states:

> It is also my information that the co-defendant, Mr. Harold Duvall Miller, has advised your office of the existence of this organization. Since this is a crucial part of our presentation at the sentencing hearing, we do deem it necessary to present all of the evidence we can to establish that our client is truthfully detailing

---

[6]  To support the assertion that Miller told others he was fearful, Petitioner again cites to letters that Miller denied having seen before. (Id., at 36-37).

[7]  To support this assertion, Petitioner cites to the following: When asked if he was aware of any help provided to his wife by an SEGM member, Miller testified: "Financially, I can't be for sure, but I believe they helped her [his wife] out a little bit, but it wasn't like it was a sustained effort, no." (Id., at 35-36). When asked if anyone from that organization gave her money, Miller stated: "I don't recall. I don't recall." (Id., at 36).

his involvement with that organization.

(Id.)  The Respondent also points out that the Petitioner testified about SEGM at the trial and denied that his involvement with the organization caused him to commit the crimes.[8]

Before addressing the alleged failure of the prosecutor to disclose the asserted information, the Court considers whether Petitioner has established that the prosecutor was aware of such information.  As for the Petitioner's assertions that Miller and Petitioner were "brainwashed" by SEGM; that Miller and Petitioner were part of a "paramilitary" group within SEGM involved in "operations" on behalf of the group; and that the group provided Miller's wife with "financial assistance," the Court is not persuaded that these assertions are supported by the record as a factual matter.  Therefore, the prosecutor did not violate Brady in connection with those assertions.

As for the remaining assertions, Petitioner has failed to show that any failure to disclose was prejudicial to the Petitioner as he either already was aware of the asserted information and disclosed it to defense counsel, or he ultimately contradicted the assertions during his sentencing hearing testimony.

The record indicates that defense counsel was aware of the involvement of SEGM prior to trial.  As noted in prior opinions, defense counsel knew prior to trial that the Petitioner was a member of SEGM, and advised the trial court of that membership because he  believed it raised security concerns. (Docket No. 156, at 29).  As noted above, defense counsel also suggested to the prosecutor that he might call him as a witness to testify about the Petitioner's relationship

_____

[8]    In an earlier decision, this Court rejected Petitioner's claim that the prosecutor erroneously argued that the SEGM did not play a role in Petitioner's crimes, when he knew otherwise. (See Memorandum and Order issued February 4, 1998 (Docket Nos. 156, 157)).

14

with SEGM, but did not ultimately do so. (Id., at 29-30). Defense counsel elicited testimony about SEGM member William Beard during the cross examination of Co-Defendant Miller at the trial. (Addendum 1, at 1527, 1567 (Docket No. 9); 999 F.Supp. at 1091). Defense counsel mentioned Petitioner's connection with the group during his argument. (Id., at 1960; 999 F.Supp. at 1091). Defense counsel also issued subpoenas for Mr. Boyd and Mr. Beard to appear at the trial, though they did not testify. (Transcript of Evidentiary Hearing, at 358 (Docket No. 186)).

During his sentencing phase testimony, Petitioner testified that Alan Boyd supplied him with a shotgun, and that Mr. Beard supplied Mr. Miller with a pistol. (Addendum I, at 1837-48, 1855-56 (Docket No. 9); 999 F.Supp. at 1091). Petitioner stated that SEGM had discussed 'cleaning up the community,' and the evil influence of 'people that take hardened drugs and sell them.' (Id., at 1839; Docket No. 156, at 30). He said the organization did not discuss 'eliminating' drug dealers, but did discuss how they should be confronted with something they fear. (Id., at 1842-1843; Docket No. 156, at 30). Petitioner said that 'no violence [was] ever really talked about, as far as killing nobody, or hurting anybody to the extent where we would violate the very thing that we say that we were about.' (Id., at 1846, 1848; Docket No. 156, at 30). The group did discuss, according to Petitioner, trying to blackmail drug dealers into providing money to SEGM. (Id., at 1848; Docket No. 156, at 30).

On cross-examination, Petitioner testified that he was not suggesting that SEGM turned him into a murderer. (Id., at 1875; Docket No. 156, at 30). He also testified that other members of the group, specifically Alan Boyd and William Beard, were not involved in the crimes. (Id., at 1879; Docket No. 156, at 30).

Based on this record, the Court is not persuaded that Miller's statements about SEGM are

15

more significant than the information that defense counsel already possessed. Accordingly, Petitioner has failed to show a reasonable probability that the result of the trial would have been different had defense counsel had notice of Miller's statements about SEGM.

Claim D.1(4) – In his Amended Petition, Petitioner contends that the prosecution failed to disclose Co-Defendant Miller's statements "to the prosecution in which he changed his story by telling the prosecution that Petitioner had mentioned before they went to Daniels' house that they would have to kill witnesses." (Amended Petition, at 56 (Docket No. 42)).[9] In his brief, Petitioner argues that notice of the changes in Miller's story over time, during lengthy coaching sessions by the prosecutor, would have been useful to the defense as it indicates that Miller's testimony had been coached.

The Respondent construes this claim as involving a prior consistent statement, which, he argues, would not be beneficial to the Petitioner.

At trial, Miller testified that prior to going to the victims' apartment, Petitioner told him that they would have to kill witnesses. (Addendum 1, at 1461 (Docket No. 9)). In his cross examination of Miller, defense counsel questioned Miller about this assertion:

> Q.	Now, in your statement of April 23rd, 1987, Mr. Miller, you point out in that statement that the reason that you went over to the home of Mr. Daniels was just for the purpose of scaring him. Isn't that correct?
>
> A.	On the night before that was the purpose.
>
> Q.	What about the day that the stabbings occurred, sir? What were your feelings – what were you going over there for on that day?

---

[9]  In his brief, Petitioner argues that this claim also involves other changes in Miller's story, but those alleged changes were not included under this claim in Petitioner's Amended Petition. These new allegations are not properly before the Court, and will not be considered.

16

A.     We were going over there to take the man's marijuana, and not leave any witnesses, as I already testified.

Q.     As Mr. Zimmermann has pointed out, in your statement of April the 23rd, 1987, which – you have had an opportunity to see your statement, haven't you?

A.     Yes, I've seen it.

Q.     Twenty-six pages long.  In that statement you never said anything about not leaving any witnesses, did you?

A.     Say that again, now.

Q.     In the statement that you initially gave to the authorities, you didn't say anything that there was a plan about not leaving any witnesses or killing the two people that were there, did you?

A.     No, I didn't say anything about that.

Q.     In fact, do you recall telling Mr. Zimmermann and Mr. Garafola that you were under the impression that it was non-violence, and it was just to, so to speak, scare Mr. Daniels?  Do you recall that?

A.     Yes, that's what I said.

Q.     And so you're now telling us that that is a lie?

A.     Yes, I'm telling you that was a lie.

Q.     That being a lie, sir, then you're telling us that you, along with Mr. Jones, went over to their home with the express purpose of stealing some marijuana and killing one or two people.  Is that right?

A.     That's true.

*  *  *

Q.     But you have told the ladies and gentlemen of the jury that you deliberately and knowingly lied to Mr. Zimmermann and Detective Garafola when you specifically omitted the fact that you were going to take care of leaving no witnesses behind.  You knowingly lied about that, didn't you?

17

A. I knowingly lied about –

Q. In not telling them on April the 23rd of this year – in not telling Mr. Zimmermann and Detective Garafola that you weren't going to leave any witnesses behind, on April 23rd when you gave them a statement you knew you were lying about that, didn't you?

A. At the time when I gave that statement, yes.

Q. The statements that you gave to Mr. Zimmermann and Detective Garafola indicated throughout your statement that the reason both the first and second time that you went to Mr. Daniels' residence was for the purpose of scaring them, non-violence scaring them. That's what you told Mr. Zimmermann and Detective Garafola about both trips to Mr. Daniels' home in your statement on April 23rd, isn't that right?

A. That's correct, if that's what's on that paper.

(Addendum I, at 1503-1505, 1517-1518) (Docket No. 9)).

Assuming the prosecution was required to disclose oral statements made by Miller during pretrial preparation, the Petitioner has not shown that the failure to disclose such statements was material. Defense counsel was clearly able to impeach Miller about his prior inconsistent statement on April 23, 1987 relating to the purpose for visiting the victims' apartment. In light of this impeachment, the Court is not persuaded that there is a reasonable probability the result of the trial would have been different had the other statements been disclosed to the defense.

Claim D.1(6) – Through this claim, Petitioner argues that the prosecution failed to disclose a portion of the handwritten report of Detective Mark Garafola reflecting his activities on the day of Petitioner's arrest. (Amended Petition, at 57). The redacted portion states as follows:

. . . When we returned to our office Det Elmore and myself attempted to interview James Jones. He was in an interview room and when we entered the room Jones was crying. He would not respond to our questions. The only

18

> statement he made was 'I only killed one man in my life and that was because he was trying to fuck me.' He then started to hit his head on the table and then he jumped up still handcuffed to the chair and banged his head up against the wall. We got him under control and then took him to the booking room. In the booking room he started to bang his head on the wall again. Det Elmore was able to control him. We took Polaroid pictures of him and also mug shots with his glasses on and off.

(Hearing Exhibit 7).

The Petitioner contends that this redaction contains exculpatory information about Petitioner's mental condition at the time of the arrest, which was relevant to both the guilt and sentencing stages of the case. Petitioner's statement about the 1972 homicide, according to the Petitioner, was also relevant to explain the prior crime.

The Respondent argues that this evidence was not exculpatory because Petitioner's banging his head against the wall could be interpreted as an act of frustration rather than a sign of mental illness, and the Petitioner had knowledge of the statements and actions detailed in the report.

The Court is not persuaded that any failure of defense counsel in pursuing a mental health defense or mitigation can be attributed to the lack of notice that Petitioner banged his head on the wall when he was taken into custody. As noted above, the Petitioner was evaluated prior to trial, and was determined not to have been insane at the time of the offense, or incompetent to stand trial. (Hearing Exhibit 35). As for mitigation, as noted above, defense counsel had various clues that should have led them to investigate Petitioner's mental health history, including the MTMHI evaluation itself and conversations with the Petitioner's wife. 999 F.Supp. at 1089.

As for Petitioner's explanation of the prior murder, the Court is not persuaded that any

failure of defense counsel to investigate the circumstances of the crime can be attributed to the lack of notice of Petitioner's statement to Detective Garafola. Defense counsel testified at the evidentiary hearing in this case that the Petitioner told him the prior crime was related to "homosexual pressure." (Evidentiary Hearing Transcript, at 294-96). It is unlikely that notice of Petitioner's similar statement to Detective Garafola would have prompted defense counsel to conduct an independent investigation of the crime.

The Court concludes that Petitioner has failed to establish materiality in connection with this claim.

Claim D.1(7) – Through this claim, Petitioner contends that the prosecution failed to disclose lab reports indicating there were no blood stains on his clothes. (Amended Petition, at 57-58). As Petitioner concedes, however, the Court has already ruled on this claim. 999 F.Supp. at 1090.[10] Petitioner argues, however, that the circumstances surrounding this claim establish the prosecutor's *modus operandi* and lack of candor.

As explained herein, the Court is not persuaded that Petitioner's prosecutorial misconduct

---

[10]  The Court ruled as follows:

As for the lab reports finding that no blood was found on clothing seized from Petitioner's apartment, there has been no evidence that the prosecutor kept this evidence from the defense. The prosecutor testified that he provided the lab reports to Petitioner's first trial counsel, Neal McAlpin, and Mr. McAlpin testified that he received them. (Transcript, at 223-25, 227, 925). Furthermore, the prosecutor testified that he filed the reports with the trial court as part of his response to the Petitioner's discovery request. (Transcript, at 911, 926; Supplemental Response Number Two To Defendant's Request For Discovery, Exhibit 19). Under these circumstances, the Court concludes Petitioner's Brady claim regarding these lab reports is without merit.

Abdur'Rahman v. Bell, 999 F.Supp. at 1090.

20

claims have merit, and declines to reconsider its decision on this claim.

Claim D.1(8) – Petitioner argues that the prosecution failed to disclose police reports that contained the following exculpatory information:

- Blood was spattered on the walls of Daniels' apartment (which suggests that the Petitioner did not perform the stabbings);[11]

- The chest of drawers in the master bedroom had not been opened and it did not appear that the room had been searched by anyone (which suggests that Petitioner did not take $300 from that location);[12] and

- When the first officers arrived at the scene, there were a number of people who had already been in the apartment (which raises a question about whether the $300 was stolen by the Petitioner).[13]

(Amended Petition, at 58).

With regard to the police report that blood was splattered on the wall, the Petitioner points out that according to expert testimony, the blood spewed from Daniels' body simultaneously with the stabbings, and the fact that there was no blood on the Petitioner's coat

---

[11]  Petitioner is apparently referring to the police report that was introduced as Exhibit 3 at the evidentiary hearing held in this case.  That report states: "I also observed a large amount of blood splattering on the items near the victim.  It was on the walls, bar and divider."

[12]  Petitioner cites Exhibit 3 to the evidentiary hearing, which states: "In the master bedroom I found a black womans (sic) purse on the bed.  All of the contents had been dumped onto the bed. . . . The chest of drawers in that room had not been opened.  It did not appear that the room had been searched by anyone."

[13]  Petitioner has failed to cite to the police report that contains this statement.  The Court notes that as part of Exhibit 1 to the evidentiary hearing held in this case is a police report authored by Tom Walsh that states: "When I went into the house there were two or three firemen, giving first aid to the victim."  He also notes that two neighbors were in the house, one of whom had been summoned by the children of Norma Norman.

suggests he was not the assailant.

Respondent argues that the portion of this claim – that the prosecution withheld a police report indicating that there was blood splatter on the victims' apartment walls – remains defaulted because the Petitioner did not present the claim to the Tennessee Court of Criminal Appeals. Petitioner points out that he argued in his state appeals court brief that the prosecution failed to disclose exculpatory evidence concerning blood tests on Petitioner's pants, and that the prosecution failed to disclose police reports that contained information about the robbery. (Addendum 12, at 27-28, 31-32 (Docket No. 9)).

The Court concludes that this claim was not fairly presented to the state courts. The Petitioner did not argue that the blood splatter information contained in the police reports was material to his case, and such a claim is not implicit in his other arguments to the state courts.

In any event, even assuming that the claim was fairly presented to the state courts, the Court concludes that Petitioner has failed to demonstrate materiality. Evidence about blood splatter at the scene and the lack of blood on the Petitioner's clothes does not necessarily suggest that the Petitioner was not the person who stabbed the victims as there is no evidence the Petitioner was wearing the clothes seized from his apartment during the shootings. 999 F. Supp. at 1096.

As for the police report regarding the condition of the bedroom, Petitioner argues this information indicates that there was no robbery. Petitioner points out that Norma Norman testified at trial that the $300 had been taken from an envelope located in a jewelry box, which was sitting on top of a dresser in the master bedroom. (Addendum 1, at 1336-37 (Docket No. 9)). According to the Petitioner, it is not plausible that the $300 was stolen from this room as the

22

room had not been searched and there was no report that the jewelry box had been opened. Thus, the Petitioner argues, the police report would have suggested that the money had not been stolen, which was relevant to the felony murder charge and at sentencing.

Petitioner has failed to establish materiality in connection with this police report. The evidence that the drawers of the chest were unopened and the room did not appear to have been searched does not suggest that a robbery did not take place. It is certainly plausible that an envelope of money could have been taken from the jewelry box without opening the drawers of the chest or without leaving evidence that the room had otherwise been searched.

As for the claim that the reports indicate a number of people had already been in the apartment before the police arrived, the Court is not persuaded this statement is supported meaningfully by the factual record, which identifies only two or three firemen, who were giving aid to the victim, and two neighbors, who had been summoned by the Norma Norman's children, as having arrived before the police. Even if defense counsel had notice of this report, it is unlikely he could have persuaded the jury that the either the firemen or the neighbors were viable robbery suspects.

The Court concludes that Petitioner has failed to establish materiality in connection with this claim.

Claim D.1(12) – Petitioner argues that although the prosecution suggested to the jury during the sentencing hearing that the Petitioner was motivated by financial problems, and that those problems were evidenced by his floating or kiting checks drawn on his account, the prosecution had information in its possession indicating that no check floating had occurred at the time of the offense. (Amended Petition, at 60). Petitioner contends that the prosecutor failed

23

to provide this information to the defense. (Id.)[14]

The Respondent argues that this information was not favorable to the Petitioner.

The bank account information cited by the Petitioner contains five entries for insufficient fund charges ("NSFCHG"). (Addendum 11, Collective Exhibit 69) (Docket No. 9)).  Petitioner argues that the records indicate no checks had actually bounced.  Even accepting the Petitioner's interpretation of the bank records, however, the records certainly indicate that the Petitioner was having financial difficulties.  Thus, the Court is not persuaded that there is a reasonable probability the result of the trial would have been different had the bank records been disclosed to the defense.

Claim D.2(1) – Petitioner claims that that the prosecution improperly altered the testimony of Co-Defendant Miller. (Amended Petition, at 60-61).  In support of this allegation, the Petitioner cites the following:

• 	The inconsistencies in Miller's trial testimony favor the prosecution's case;

• 	The prosecution's records indicate that the prosecution spent considerable time with Miller between his April 23, 1987 statement and Petitioner's trial;

• 	Miller's trial was not scheduled until after Miller testified in Petitioner's case;

• 	The prosecution offered not to seek the death penalty against Miller in exchange for Miller's testimony in Petitioner's case;

• 	Miller's use of language in his testimony was suspiciously similar to the legal language supporting the State's case and the language used by Norman (as, for example, in both

_____

    [14]   Petitioner's brief cites Collective Exhibit 69 to the postconviction hearing held in state court as the information that should have been disclosed to the defense.  (Addendum 11, Collective Exhibit 69) (Docket No. 9)).

24

witnesses' use of the word "gangster" to refer to the coat Petitioner wore on the night of the offenses); and

• The State demonstrated in other areas a willingness to be deceptive and to alter or improperly influence evidence and testimony.

(Id.) Petitioner argues that prosecutor Zimmerman was well aware that Miller's testimony was false, and elicited testimony from Miller that amounted to perjury.

Respondent argues that his claim is procedurally defaulted because the Petitioner did not present it to the Tennessee Court of Criminal Appeals. The Petitioner responds by pointing to the argument in his brief before the state appeals court that the prosecution presented a theory to the jury that it knew to be false, and that it did this through Miller's testimony and arguments to the jury. (Addendum 12, at 29-31 (Docket No. 9)).

The Court concludes that this claim was fairly presented to the state appeals court. The Petitioner's state court brief discusses the various inconsistent statements made by Miller, and argues that the prosecution presented a theory it knew to be false through Miller's testimony.

Alternatively, the Respondent contends that this claim is without merit because the prosecution did not elicit false testimony.

The Supreme Court has held that a defendant's right to a fair trial may be violated when the prosecution deliberately misleads a jury through the presentation of false evidence. Giglio v. United States, 405 U.S. 150, 153-54, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). "A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" Id.; Carter v. Mitchell, 443 F.3d 517, 535 (6th Cir. 2006). The Sixth Circuit has held that in order to establish a denial of due process due to this type of prosecutorial

25

misconduct, the petitioner must show: (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false. <u>United States v. Lochmondy</u> 890 F.2d 817, 822 (6th Cir. 1989); <u>Coe v. Bell</u>, 161 F.3d 320, 343 (6th Cir. 1998). Mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony. <u>Id.</u>

The Petitioner argues that the false theory presented to the jury through Miller was that the motive for the murder was to steal Daniels' drugs and money, that the Petitioner was the one who stabbed Daniels, and that he acted coolly and without emotional disturbance when committing the killing. The Court must first determine whether the prosecution presented false testimony to support these propositions.

To support his argument that Miller's testimony was false regarding the motive for the murder, Petitioner cites Miller's sentencing hearing testimony and his testimony in the state postconviction hearing. During the sentencing hearing, Miller testified, in pertinent part, as follows:

Q.	Mr. Miller, the Judge has heard you testify at trial, so he knows what you did. Why did you do it?

A.	The organization that I'd gotten myself involved in was to help the community to rid the drug dealers, and things like that, you know, because it was a bad influence. And I just got in over my heard, as far as understanding the possible criminal implications that are now involved.

Q.	Well, obviously you knew that it was against the law to kill somebody?

A.	Yes.

Q.	And you knew that, and you knew it was against the law to rob somebody?

A.	Yes, sir.

Q.	Did you believe James Jones when he said that ya'll were going to kill the

26

witnesses after that robbery?

A.    No, not really.

Q.    What did you think he meant?

A.    Maybe beating them up, or something like that, but killing someone was just, to me it was just abstract and you know, it was something I didn't think he would do.

Q.    You've never seen anybody die?

A.    No.

Q.    When you got to the home of Norma Norman and Patrick Daniels, you were carrying a gun?

A.    Yes.

Q.    Was that gun loaded?

A.    No, it was not.

Q.    Where had you gotten that gun?

A.    As I stated in the trial before, a guy by the name of William Beard, that was also part of this organization had given it to me.

* * *

Q.    When you went to the place, the home of Norma Norman and Patrick Daniels, you knew that a robbery was going to occur?

A.    Yes.

Q.    You knew you were going to violate the law?

A.    Yes.

Q.    Had you ever robbed anybody before?

A.    No.

Q.    Well, why were you willing to rob these people?

27

A.      Following James.  You know, he had convinced me, you know, that this was right, you know.  This was the right thing to do to, you know, to stop him from distributing drugs.

* * *

Q.      Why did you follow him? Why pick him as your leader?

A.      Well, the way the organization was set up, James was more or less like a general, so to speak.  The individuals that were over him, to my understanding, had designated him to more or less, you know, work with soldiers, quote, unquote.

(Hearing Exhibit 93, at 24-28).

Petitioner also cites the following portion of Miller's testimony at the state postconviction hearing:

Q.      Mr. Miller, I got just a little bit confused when we were talking about Mr. Boyd and Mr. Beard.  After the murder and assault on Ms. Norman you indicated that a phone call was made. Do you know who the defendant called?

A.      All I know is that he made a phone call, Alan Boyd showed up.  Now whether he called John Doe or whoever.

Q.      And then it was Alan Boyd who you said was not happy about whatever it was Mr. Jones was telling him; is that correct?

A.      Correct.

Q.      And then was it Mr. Boyd who gave you money to leave town or was it Mr. Beard who gave you money to leave town?

A.      Mr. Beard.

Q.      Mr. Beard.

A.      Yes.

Q.      Was Mr. Boyd a part of that?

A.      As giving me money?

28

Q. To leave town?

A. Could you be more –

Q. Was it a group effort that he and Mr. Beard gave you money to leave town?

A. No.

(Addendum 11, at 41-42 (Docket No. 9)).

This testimony, according to the Petitioner, contradicts Miller's trial testimony that he and the Petitioner planned to rob Daniels, and that the Petitioner said they could not leave any witnesses. (Addendum 1, at 1460-63 (Docket No. 9)). Petitioner points out that Miller did not testify at trial that the crime was part of an effort to rid the community of drug dealers.

Even if the Court assumes that Miller's testimony was false for what it left out, however, the omission was not material to Petitioner's conviction. Miller's sentencing hearing testimony indicates that while the ultimate goal may have been to rid the community of drug dealers, he still intended to rob the victims, and to eliminate witnesses.

Moreover, as discussed above, there was other testimony at trial about SEGM. Defense counsel elicited testimony from Miller on cross examination that Petitioner told Daniels he was there to clean up Nashville, meaning he wanted to get rid of drug dealers. (Addendum 1, at 1528-29 (Docket No. 9)). Miller testified that Beard provided him with the weapon he used on the night of the stabbings, and that he told Beard he stashed the weapon after leaving the victims' apartment. (Id., at 1526-27). As discussed above, Petitioner testified about the influence of SEGM at the sentencing hearing.

Petitioner has failed to establish materiality in regard to Miller's testimony about the motive for the crime.

29

With regard to Miller's testimony that Petitioner was the one who stabbed Daniels, and that he acted coolly and without emotional disturbance when committing the killing, Petitioner has not presented evidence establishing the falsity of this testimony. Thus, these claims are without merit.

Claim D.2(2) – Petitioner claims that the prosecution gave false and misleading information to the Middle Tennessee Mental Health Institute ("MTMHI") in connection with its pretrial psychological evaluation of the Petitioner. (Amended Petition, at 61-3). The Petitioner specifically cites a letter dated February 10, 1987 sent by the prosecution to MTMHI, which includes the following assertions:

- The Petitioner was not associated with a particular religious organization;

- The police theorize that he was attempting to become entrenched as a drug distributor in Nashville by taking over the victim's operation;

- The Petitioner had taken the name of "Scarface" in the local drug community;

- The Petitioner's credibility was questionable; and

- The Petitioner told police that the man he murdered in prison was a homosexual and that he murdered him in self-defense to prevent being raped when the records reflect that the Petitioner was a leader of a prison gang attempting to gain control over the victim's gang and that he engaged in a cold blooded premeditated murder.

(Id.) The Petitioner argues that the information in the letter is false because the prosecution knew that the Petitioner was a member of SEGM, a religious organization; had no evidence that the Petitioner was seeking to become entrenched as a drug distributor; had no evidence that the Petitioner had assumed the name "Scarface;" and had no evidence that the Petitioner was a

leader of a prison gang attempting to take over the victim's gang in connection with the 1972 murder.

Respondent argues that a portion of this claim has been procedurally defaulted. The Court disagrees. In his brief to the Tennessee Court of Criminal Appeals, the Petitioner complained of prosecutorial misconduct, which included the argument that the prosecutor provided MTMHI false information about the 1972 murder. (Addendum 12, at 28-29 (Docket No. 9)). The Petitioner then referred to another portion of the brief, which complained of other statements in the prosecutor's letter to MTMHI, including that the Petitioner was not associated with a religious organization, that he was trying to take over the victim's drug distributing operation, and that he had taken the name of Scarface. (Id., at 18-20). The Court concludes that this claim was fairly presented to the state courts, and has not been procedurally defaulted.

As to the merits of the claim, the Respondent argues that the statements cited by the Petitioner are taken out of context, and that the record supports the statements made by the prosecutor. Therefore, the Respondent contends, the prosecutor did not provide knowingly false information to MTMHI.

The Court finds it unnecessary to determine whether the statements by the prosecutor were false or merely taken out of context. The focus of the Court's inquiry is not simply on the culpability of the prosecutor, but whether the prosecution's statements rendered the trial fundamentally unfair. Pritchett v. Pitcher, 117 F.3d 959, 964 (6th Cir. 1997). In arguing that the statements had such an effect, the Petitioner cites the testimony of the MTMHI physician who performed the evaluation on the Petitioner, Dr. Samuel Craddock. At the evidentiary hearing, Dr. Craddock testified that, based on the Petitioner's social history, which he did not have at the time

of the evaluation, he could not rule out a diagnosis of Borderline Personality Disorder. (Evidentiary Hearing Transcript, at 140 (Docket No. 185)). The Petitioner then argues that it is reasonable to infer that if the prosecution had provided the transcript of the 1972 murder trial to Dr. Craddock, which included testimony that the Petitioner had been diagnosed with Borderline Personality Disorder, he likely would have investigated Petitioner's social history, which would have changed his evaluation. This argument essentially focuses on the information MTMHI did not have when it performed the evaluation, rather than any relationship between the statements made in the prosecutor's letter and the results of the evaluation.

The Petitioner has not cited any testimony of Dr. Craddock or anyone else at MTMHI indicating that the results of the pretrial evaluation that the Petitioner was competent to stand trial and was not insane were based on the prosecution's statements in the February 10, 1987 letter. Thus, Petitioner has failed to show that the statements in the prosecutor's letter rendered the trial fundamentally unfair.

Claim D.2(3) – Through this claim, Petitioner contends that the prosecution deliberately attempted to manipulate Norman's testimony by asking her leading questions so that she would say the $300 alleged to have been stolen belonged to both her and Daniels, rather than to her alone. (Amended Petition, at 63). To support his claim of misconduct, the Petitioner points to the prosecutor's trial notes with the notation: "Items taken – $300 cash and anytime teller card (leading questions to make her say it was theirs)," and "$300 and anytime teller card (leading questions to make her say it was theirs)." (Id.) Petitioner argues that without an armed robbery conviction, the conviction for felony murder could not stand.

Respondent argues that actual ownership of the money was not material because the

32

indictment alleged that the money was in possession of Daniels, and the money was taken from the bedroom Daniels shared with Norman. In addition, Respondent points out that the Tennessee Supreme Court found the evidence sufficient to support the armed robbery conviction on the basis of Daniel's bank card alone.

In an earlier Memorandum, this Court held that there was sufficient evidence to uphold the robbery conviction:

> Although the evidence was circumstantial, it was still sufficient to allow the jury to find the elements of robbery beyond a reasonable doubt. Under the Jackson v. Virginia standard, the evidence supporting the conviction need not be direct evidence. York v. Tate, 858 F.2d 322, 326-30 (6th Cir. 1988). Here, the jury heard testimony that the victims had $300 at their apartment before the Petitioner arrived, that the Petitioner asked for money before he stabbed the victims, that the Petitioner entered the bedroom where the money was kept FN5, the money was no longer in the apartment after the stabbings, and Ms. Norman's purse was found open on the bed in the bedroom where the money was kept.

> > FN5  Petitioner argues that the testimony of Mr. Miller and Ms. Norman conflict as to when or whether the Petitioner entered the bedroom. The jury was free, however, to credit the testimony of Mr. Miller that the Petitioner entered the bedroom before taping Ms. Norman. See Walker v. Russell, 57 F.3d 472, 475 (6th Cir. 1995) (the jury's credibility determinations are entitled to 'special deference.')

> > In any event, both Ms. Norman and Mr. Miller testified that the Petitioner took Mr. Daniel's bank card. Petitioner argues that there was no evidence Mr. Daniels had a bank account, and therefore, the bank card had no value. Under Tennessee law, however, the value of the property taken is not material to a robbery conviction. Cook v. State, 3 Tenn. Crim. App. 685, 466 S.W.2d 530, 532 (1971).

(Docket No. 156, at 16-17).

Based on this reasoning, the Court concludes that the alleged manipulation of Norman's testimony was not material as there was sufficient evidence to support the robbery conviction based on Daniel's bank card, for which there was no dispute as to ownership.

33

Claim D.3 – Petitioner argues that the prosecutor engaged in misconduct when he misled defense counsel regarding the nature of the prior 1972 conviction. (Amended Petition, at 64-65). According to the Petitioner, the prosecutor told defense counsel that Petitioner's 1972 murder conviction was part of a "drug turf war" when he knew that was not the case. (Id.) Petitioner argues that this misrepresentation was exacerbated by the prosecutor's failure to disclose the transcript of the murder trial to the defense. (Id.)[15]

The Respondent argues that the prosecutor's version of the 1972 murder was based on what he had been told by the federal agents and prosecutors who had investigated the case, and that there is evidence in the record to support the prosecutor's version of the prior crime. He also contends that the prosecutor was seeking to refute the Petitioner's statement that the 1972 murder was an act of self defense.

In a prior opinion, this Court found that the 1972 murder was not over drugs and gangs as represented by the prosecution to defense counsel, and that defense counsel provided deficient representation by failing to investigate the nature of that murder, among other failures. 999 F.Supp. at 1095 n. 27, 1099-1100. The Court held that failure to introduce evidence about the prior murder, among other failures, prejudiced the Petitioner at the penalty phase. Id. That holding was reversed by the Sixth Circuit. 226 F.3d at 707-09.

---

[15] As noted above, the Court has already addressed Petitioner's related claim that the prosecution violated Brady in failing to provide the transcript to the defense. 999 F.Supp. at 1088-90. In arguing that the transcript was exculpatory, Petitioner cited the testimony in the transcript that the Petitioner had mental health issues. Id. The Court determined that while the transcript was favorable to the Petitioner, it was not material to his case because defense counsel already had various clues that should have led them to investigate Petitioner's mental health history, and that the transcript would not have been a key element in prompting defense counsel to take action. Id.

As discussed above, the Court finds it unnecessary to determine the state of mind of the prosecutor when he described the nature of the 1972 murder to defense counsel. In determining whether the prosecution's statements rendered the trial fundamentally unfair, the Court must focus on the effect of the prosecutor's characterization of the crime. See Pritchett v. Pitcher, 117 F.3d at 964. As this Court previously found, defense counsel was deficient in failing to conduct an independent investigation of Petitioner's prior conviction. 999 F.Supp. at 1095 n. 27 ("Given his failure to investigate Petitioner's prior convictions, Mr. Barrett did not have any independent information about the conviction, and therefore, did not introduce mitigating evidence about this conviction at the sentencing hearing.").

The Court is not persuaded that the failure to explain or introduce mitigating evidence about this prior crime is a direct result of the prosecutor's statements to defense counsel. Rather, such a failure must be laid squarely at the feet of defense counsel who had a duty to conduct an independent investigation of circumstances of the prior crime. As noted above, defense counsel testified at the evidentiary hearing in this case that the Petitioner told him the prior crime was related to "homosexual pressure." (Evidentiary Hearing Transcript, at 294-96). Therefore, he had a basis for questioning the prosecution's version of events. Furthermore, the Court is not persuaded that providing testimony explaining the nature of the prior conviction during the sentencing phase, in and of itself, would have affected the jury's decision to impose the death penalty.

The Court concludes that Petitioner has failed to establish the prosecutor's statements regarding the 1972 murder rendered his trial fundamentally unfair.

Claim D.6 – Through this claim, Petitioner argues that, during the sentencing phase, the

prosecution passed copies of prior indictments of the Petitioner to the jury after assuring the trial

court that the documents would not be passed to the jury. (Amended Petition, at 67-68).

Petitioner also claims that the prosecution allowed a prosecution witness to testify as to the facts

of Petitioner's prior convictions. (Id.)  Respondent argues that the Court has already ruled on the

merits of this claim.

In an earlier Memorandum, the Court ruled that the prosecutor's actions did not render

the trial fundamentally unfair.[16]

---

[16]  The Court ruled as follows:

Petitioner claims that the prosecution engaged in prosecutorial misconduct
during sentencing by passing previous indictments to the jury after assuring the
court that they would not do so, and also in allowing a witness to testify about
Petitioner's prior convictions (Amended Petition, at ¶ D6).

On direct appeal, the Tennessee Supreme Court found that these matters
constituted error but that the error did not require reversal:

Defendant says the trial court should have declared a
mistrial when the State passed copies of previous indictments to
the jury after assuring the court that would not happen, and also in
allowing a State's witness to testify as to the facts of defendant's
prior convictions.

Defendant made a motion in limine prior to the sentencing
hearing to prohibit any mention at the hearing that defendant was
on parole at the time of the offense.  In the course of arguing the
motion the State's attorney stated he would not pass the records of
defendant's prior murder conviction to the jury since they showed
that defendant had received a life sentence and described the
circumstances of the crime.  Defendant's parole officer, who was
identified only as an employee of the U.S. District Court in
Nashville, testified to introduce the fact of defendant's two prior
convictions for second degree murder and assault with a deadly
weapon.  The State was allowed over defense objection to ask the
nature of the deadly weapon.  The witness answered that it was a
knife.  The State's attorney then passed to the jury the record of

36

defendant's conviction for assault with a deadly weapon which included a two-count indictment charging him with robbery in addition to the assault. Defense counsel raised an objection on the basis that the information it contained was irrelevant and requested the court to instruct the jury that the only information contained in the record which was applicable was the fact of the conviction. The trial judge gave the instruction requested.

The defense objection was appropriate. The conduct of the State's attorney bordered on deception by which he was able to get before the jury information which was not evidence in the case they had under consideration. The action of the State was improper. However, we have reviewed this record carefully and conclude that the error does not require a reversal of the defendant's sentence. In a similar situation in State v. Williams, 657 S.W.2d 405-413 (Tenn. 1983) the Court, citing Judge v. State, 539 S.W.2d 340 (Tenn. Cr. App. 1976), had this to say:

> 'In consideration of whether improper conduct on the part of the State requires reversal, a court may look to several factors, such as the effect of curative measures taken by the trial court, the intent of the prosecution, the cumulative effect of the improper conduct and any other errors in the record, and the relative strength of the case.'

We decline to remand this case for a new sentencing hearing. The defendant did not deny the homicide or the assault on the victims. He endeavored to mitigate the circumstances of the offenses by testifying that he suffered from a memory lapse regarding their occurrence. We give the State the benefit of the doubt insofar as the intent was concerned. We do not find any cumulative effect of the improper conduct nor is there other reversible error in the record. As in Williams, supra, we consider it pertinent to point out that the fact of a prior sentence has nothing to do with the conviction and should not be admitted as evidence except by agreement.

State v. Jones, 789 S.W.2d at 551-52.

The Petitioner does not appear to contest the underlying factual findings of the state court on this issue. Even if he does, however, the Court concludes

that the state court's factual findings are entitled to a presumption of correctness. Petitioner's complaints about counsel do not relate to their handling of this issue. Petitioner's complaints about the conduct of the prosecutors do not suggest that they prevented him from fully presenting this claim to the state courts. Therefore, the Court concludes that Petitioner received a full and fair hearing on this issue before the state courts. In addition, the Court concludes that these factual findings are supported by the record.

As explained by the state court, the record indicates that after the trial court ruled that the prosecution would not be allowed to adduce evidence regarding the facts underlying Petitioner's previous convictions or the sentence he received, the prosecutor stated that he did not intend to pass to the jury the records regarding those convictions. (Addendum I, 1794-1795). During the direct examination of Lewis Trammel of the United States Probation Office, however, the prosecutor admitted into evidence and published to the jury information indicating that the Petitioner had been charged with, but not convicted of, armed robbery. (Addendum I, 1808-1823).

Petitioner's claim focuses on the conduct of the prosecutor in disclosing the armed robbery charge to the jury, and the trial court's ruling allowing the witness to describe the 'dangerous weapon' involved in the prior assault conviction as a knife. In order to establish prosecutorial misconduct, Petitioner must show that the conduct 'was so egregious so as to render the entire trial fundamentally unfair.' Pritchett v. Pitcher, 117 F.3d 959, 964 (6th Cir. 1997) (quoting Cook v. Bordenkircher, 602 F.2d 117, 119 (6th Cir. 1979)). See also Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974). The court is to examine 'the fairness of the trial, not the culpability of the prosecutor.' Pritchett, 117 F.3d at 964. The allegation presents a mixed question of law and fact, which the Court reviews de novo. Duvall v. Reynolds, 131 F.3d at 933.

The standard for reviewing claims that a trial court erroneously admitted evidence is a similar one. Erroneous state court evidentiary rulings may not serve as the basis for issuance of a writ of habeas corpus unless the error 'fatally infected the trial and rendered it fundamentally unfair' so as to constitute a denial of due process. Moore v. Tate, 882 F.2d at 1109; Duvall v. Reynolds, 131 F.3d at 926; Ivy v. Bowersox, 122 F.3d at 676.

Even if the Court assumes the trial court erred in admitting evidence that a knife was used in the prior assault, the Court is not persuaded that that evidence and the evidence that Petitioner had been charged with armed robbery rendered Petitioner's sentencing hearing fundamentally unfair. The jury had already found

38

Petitioner raises this claim here as part of his argument that the cumulative effect of all the instances of prosecutorial misconduct resulted in prejudice to the Petitioner, and rendered his trial fundamentally unfair. As explained herein, the Court is not persuaded that Petitioner's prosecutorial misconduct claims have merit. The Court declines to reconsider its decision on this claim.

Claim D.8(1) – Petitioner argues that the prosecution's argument, during the sentencing stage, that the Petitioner killed for "pure pleasure" was improper, misleading and inflammatory. (Amended Petition, at 71). Specifically, the Petitioner points to the following statements made by the prosecutor: "Is there any justification or excuse for it that mitigates it, that makes light of

---

the Petitioner guilty of assault and murder before this evidence was admitted at the sentencing hearing. Moreover, in testifying during the sentencing hearing, the Petitioner admitted that he committed the murder. The Court concludes that the Petitioner did not suffer any actual prejudice because the jury knew the type of weapon the Petitioner had used in a previous assault when they ruled on the existence of the three aggravating circumstances at sentencing.

Whether the Petitioner had robbed the victims in the course of committing the murder was an issue at sentencing and directly related to one of the aggravating circumstances. The Court is of the opinion, however, that admission of this evidence did not render the trial fundamentally unfair. First, the Court notes that the jury had already found the Petitioner guilty of armed robbery when this evidence was admitted at sentencing. Furthermore, the trial court gave a limiting instruction that the previous convictions were the only items of evidence they were to consider. See Sizemore v. Fletcher, 921 F.2d 667, 670 (6th Cir. 1990): Garofolo v. Coomb, 804 F.2d 201, 205 (2nd Cir. 1986) (prosecutor's improper remarks were harmless in light of other evidence and court's curative instruction).

Although the conduct of the prosecutor is troubling, Petitioner has not demonstrated that these errors rise to the level of a constitutional violation. Respondent is entitled to summary judgment on this claim.

(Docket No. 156, at 22-25).

it, that says it's all right. . . . Is there any reason, as a mitigating factor – is there any reason, is there any justification why he took the life of Patrick Daniels?  Is there any?  None, except pure pleasure." (Addendum 1, at 1942 (Docket No. 9)) "And when he comes here from Chicago, he is not here two years before a vicious brutal murder at his hands – at his planning – at his enjoyment – and that's depraved." ( Addendum 1, at 1984-85 (Docket No. 9)).

In order to establish prosecutorial misconduct based on the prosecutor's closing argument, the Petitioner must show that the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).  In Broom v. Mitchell, 441 F.3d 392, 412 (6th Cir. 2006), the Sixth Circuit explained that the challenged conduct must be both improper and flagrant, and discussed several guidelines for analyzing counsel's arguments:

> First, '[a]dvocates have an obligation to ... put forth only proper arguments based on the evidence in the record.' Id.  Also, they must obey 'the cardinal rule that a prosecutor cannot make statements "calculated to incite the passions and prejudices of the jurors.' Gall v. Parker, 231 F.3d 265, 315 (6th Cir.2000) (quoting United States v. Solivan, 937 F.2d 1146, 1151 (6th Cir.1991)), cert. denied, 533 U.S. 941, 121 S.Ct. 2577, 150 L.Ed.2d 739 (2001). Finally, we have held that a prosecutor may not make improper comments 'designed to completely undercut the defendant's sole mitigation theory, effectively denying him fair jury consideration.' DePew v. Anderson, 311 F.3d 742, 749 (6th Cir.2002), cert. denied, 540 U.S. 938, 124 S.Ct. 83, 157 L.Ed.2d 250 (2003). Once conduct is held to be improper, there are four factors that we consider in determining flagrancy:

>> (1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant.

> Bates v. Bell, 402 F.3d 635, 641 (6th Cir. 2005).

441 F.3d at 412-13.

In applying these standards to the remarks made by the prosecutor, the Court must consider whether they were supported by the evidence that had been adduced at trial. According to the surviving victim, Norma Norman, the Petitioner gave the orders on the night in question, and appeared to be calm. (Addendum 1, at 1354, 1362 (Docket No. 9)). Norman testified that the Petitioner told Miller to use the duct tape he brought to tape Daniels. (Id., at 1365-66). Because Miller was "too shaky," Norman testified, the Petitioner took the tape and taped Daniels' feet, hands, and later, his eyes and mouth. (Id., at 1367-68). He did the same to her. (Id., at 1370-73, 1376). After observing the Petitioner take Daniels' bank card and get his access number, Norman heard (but was unable to see) a grunting sound come from Daniels as if he had been kicked, and then, a gush of blood. (Id., at 1376). Norman testified that she then felt someone deliver two blows to her back, but did not realize until later that she had been stabbed twice and that the knife was still lodged in her back. (Id., at 1377, 1387). The medical examiner testified that Daniels had been stabbed six times. (Id., at 1658).

Miller testified that the Petitioner planned to kill the victims before they entered the apartment, that Daniels cried and begged Petitioner not to hurt anyone, and that the Petitioner was "cool" and "under control" as he stabbed Daniels, and was "working himself up on a rhythm" as he stabbed Norman. (Id., at 1461, 1468-69, 1474, 1534-36).

Based on this and other evidence, the Court concludes that the prosecutor's remarks describing the Petitioner as "depraved" and as one who killed for "pure pleasure" were not so improper or flagrant as to render the trial fundamentally unfair. One of the aggravating circumstances at issue was whether the murder "was especially heinous, atrocious or cruel, in that it involved torture or depravity of mind." (Addendum 1, at 1990-91 (Docket No. 9)). Thus,

41

the words used by the prosecutor related to the issues to be decided by the jurors. The Petitioner's position that Miller is not credible, and that an alternative theory explains the events that occurred, does not make the prosecutor's comments improper. There was evidence to support the prosecutor's theory of the facts even if that theory is not the one propounded by the Petitioner.

The Court concludes that Petitioner has failed to establish the prosecutor's closing argument at sentencing rendered his trial fundamentally unfair.

Claim D.8(4) – Petitioner argues that the prosecution made the misleading and inaccurate argument to the jury that the SEGM and its leaders played a diminished role in the commission of the crimes, when they knew or should have known the true role of the SEGM leadership leading up to and allowing the crimes to occur. (Amended Petition, at 72-73). Respondent argues that the Court has already ruled on the merits of this claim.

In an earlier Memorandum, this Court ruled that the State's argument at sentencing regarding SEGM did not constitute prosecutorial misconduct.[17]

---

[17]   The Court ruled as follows:

      Petitioner argues that the prosecutor knew that the Southeast Gospel Ministry ("SEGM") played an important role in influencing the Petitioner to commit the crimes for which he was convicted, but erroneously argued that the SEGM did not play a role in Petitioner's crimes.

      In order to establish prosecutorial misconduct based on the prosecutor's closing argument, Petitioner must show that the prosecutor's comments were 'so egregious so as to render the entire trial fundamentally unfair.' Pritchett v. Pitcher, 117 F.3d at 964 (quoting Cook v. Bordenkircher, 602 F.2d 117, 119 (6th Cir. 1979)). See also Donnelly v. DeChristoforo, 94 S.Ct. at 1871. The allegation presents a mixed question of law and fact, which the Court reviews de novo. Duvall v. Reynolds, 131 F.3d at 933.

42

The portion of the prosecutor's argument to which Petitioner objects is as follows:

> You only heard Mr. Barrett tell you one thing, ladies and gentlemen, in his whole trial -- now, he voir dired you on, would you believe a psychiatrist, or a psychatric (sic) examination or whatever, about extreme emotional disturbance or whatever? There is none of that here today. We're down to him saying, I was confused about what I was there for. He comes up with this group, and he names off the names -- guys that give him guns that he used in this robbery, and he says that I was confused about what I was doing there. I think I was there to teach somebody a lesson -- like that, and like that (indicating exhibits)? I was in this group three or four months before I did these murders. Ladies and gentlemen, he was a murderer, and he was a murderer before he ever got in that group -- just a low down murderer, no morals -- no morals.
> He ties up two people. And, ladies and gentlemen, it's because of some religious affiliation or club. Well, where is that evidence, if those people can come in here and tell you that, yeah, it was that? Devalle Miller told you why it was. And you know something, ladies and gentlemen, there is one last link in all of this, and that is he still says that the Sunday night visit never happened, like Mr. Miller said it happened. And do you know why? Because if you believe it did happen -- if you believe that Devalle went there with him and was going to do this fake robbery -- well, he knows -- he knows that that story about being a religious cause will be rejected by you as bunk. He knows that. . .

(Addendum I, at 1981-1983).

To support his argument that the prosecution knew that SEGM played an important role in influencing him to commit the crimes at issue, Petitioner has filed the affidavit of Ross Alderman, who represented the co-defendant in this case, Harold Devalle Miller. (See Petitioner's Exhibit 16, Docket No. 114). Mr. Alderman states that the prosecutors met with Mr. Miller several times before the trial, and that during these meetings, Mr. Miller described SEGM in detail and said that the organization had been involved in some events leading up to the offense in this case. (Id.).

Although it is not a part of the record, the parties state that during jury selection, the trial court had an in-chambers conference concerning courtroom security. Respondent states that during that conference, defense counsel

43

presented information to the prosecutor that Petitioner was a member of a religious organization, which raised security concerns. Petitioner states that the prosecutor 'was sufficiently concerned about what he had learned about the SEGM that, at the close of jury selection, he requested defense counsel to turn over their jury list in order to protect the safety of the jurors.' (Petitioner's Memorandum In Response To Respondent's Summary Judgment Motions And In Support Of An Evidentiary Hearing (Docket No. 113), at 89).

The record does indicate that prior to beginning of the sentencing hearing, Petitioner's counsel served the prosecutor with a letter indicating that he might call the prosecutor as a witness to testify that Petitioner was a member of SEGM. (Addendum I, at 1799-1803). The prosecutor objected, and told the trial court that his knowledge of SEGM was based on information obtained from Harold Devalle Miller and defense counsel. (Id.) Defense counsel did not call the prosecutor to testify on this point.

During the sentencing phase, Petitioner testified about SEGM. Petitioner stated that he was a member of SEGM, that the group had discussed 'cleaning up the community,' and the evil influence of 'people that take hardened drugs and sell them.' (Addendum I, at 1839). He said the organization did not discuss 'eliminating' drug dealers, but did discuss how they should be confronted with something they fear. (Addendum I, at 1842-1843). Petitioner said that 'no violence [was] ever really talked about, as far as killing nobody, or hurting anybody to the extent where we would violate the very thing that we say that we were about.' (Addendum I, at 1846, 1848). The group did discuss, according to Petitioner, trying to blackmail drug dealers into providing money to SEGM. (Addendum I, at 1848).

On cross-examination, Petitioner testified that he was not suggesting that SEGM turned him into a murderer. (Addendum I, at 1875). He also testified that other members of the group, specifically Alan Boyd and William Beard, were not involved in the crimes. (Addendum I, at 1879).

The Court is not persuaded that the prosecutor's closing statements were improper. The Court construes the prosecutor's remarks as making two points. First, the prosecutor was arguing that even if the Petitioner was involved in a group that encouraged violence, he was still culpable, and pointed out that Petitioner had been convicted of murder before he joined SEGM. Second, the prosecutor argued that there was not enough evidence to establish that Petitioner was acting on the basis of a religious cause.

Petitioner's contention that the prosecutor argued SEGM had no influence

Petitioner raises this claim here as part of his argument that the cumulative effect of all the instances of prosecutorial misconducted resulted in prejudice to the Petitioner, and rendered his trial fundamentally unfair. As explained herein, the Court is not persuaded that Petitioner's prosecutorial misconduct claims have merit. The Court declines to reconsider its decision on this claim.

---

on Petitioner when he knew that to be false does not apply to the first point made by the prosecutor. Even if the Petitioner could establish that SEGM played a vital role in Petitioner's crimes and that the prosecutor knew it, the prosecutor is free to argue that the group's involvement does not lessen the culpability of the Petitioner.

As for the second point made by the prosecutor, given the Petitioner's testimony during the sentencing phase of the trial that SEGM did not advocate violence or murder, the Court concludes that it was not improper for the prosecutor to argue that the evidence was not sufficient to establish that Petitioner acted on the basis of a religious cause.

Petitioner has not shown that the prosecutor's comments were so egregious so as to render the entire trial fundamentally unfair. Accordingly, Respondent is entitled to summary judgment on this claim.

(Docket No. 156, at 28-31).

## IV. Conclusion

For the reasons set forth above, the Court concludes that Petitioner's claims are without merit, and are dismissed.

It is so ORDERED.

TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE